Judge ERDMANN delivered the opinion of the court.
Private Bryant K. Marsh was acquitted of rape but convicted of making a false official statement at a general court-martial with members. He was sentenced to a bad-conduct discharge, forfeiture of $1,347.00 pay for one month, and a reduction to E-l.[1] The convening authority approved the sentence and the United States Army Court of Criminal Appeals summarily affirmed the findings and sentence. United States v. Marsh, No. ARMY 20080382, slip op. at 1 (A.Ct.Crim. App. Oct. 7, 2010).
“Merely urging the court members to consider an unsworn statement for what it is falls within the boundary of fair prosecuto-rial comment.” United States v. Breese, 11 M.J. 17, 24 (C.M.A.1981) (citations omitted). In addition, “it is error for trial counsel to make arguments that ‘unduly ... inflame the passions or prejudices of the court members.’” United States v. Schroder, 65 M.J. 49, 58 (C.A.A.F.2007) (quoting United States v. Clifton, 15 M.J. 26, 30 (C.M.A.1983)). We granted review to consider whether the trial counsel’s closing argument improperly invited the panel to draw an adverse inference from Marsh’s decision to give an unsworn statement, and also to determine whether the trial counsel’s argument unduly inflamed the court members by implying that Marsh would endanger pilots’ lives if he were allowed to remain in the Army.[2] While we *103 conclude that the trial counsel’s reference to Marsh’s unsworn statement did not constitute error, portions of the trial counsel’s closing argument were unduly inflammatory. We therefore reverse the decision of the Army Court of Criminal Appeals as to the sentence, set aside the sentence, and remand the case for a sentencing rehearing.

BACKGROUND

Private Bryant Marsh repaired helicopters for the 82nd Combat Aviation Brigade of the 82nd Airborne Division at Fort Bragg, North Carolina. One evening Marsh went to Private CG’s barracks room and asked her to go to a club with him and some fellow soldiers. En route to the club the group stopped and purchased alcohol and soda. CG poured out all but three inches of Coke from a twenty-ounce bottle and filled the rest with Hennessy Cognac. CG drank the contents of the bottle before they entered the club. CG remembered having several more drinks in the club, but remembers nothing more of the evening.
After CG became intoxicated at the club, two of the soldiers in the group tried to take her back to her barracks room but were unable to enter the post as she did not have her identification card. They then took CG to the hotel room of one of the soldiers where she passed out on the bed. Later that night Marsh arrived at the hotel room and took CG back to her barracks room, where they engaged in sexual intercourse. CG testified that she remembered nothing between being in the club and waking up the next morning to find her supervisor and medics in her barracks room. CG later went to the hospital where she completed a restricted rape report.[3] She testified that she did not want to file an unrestricted report “[b]ecause I wasn’t sure what happened to me and I didn’t want to just blame somebody for something.”
Almost two months later, CG listened to a cell phone recording of Marsh talking to another soldier. In the call Marsh referenced a list of men that CG had slept with and included his name on that list. CG testified that she was shocked when she heard that as she was unaware she had slept with him. She then contacted the Fort Bragg Criminal Investigation Division (CID) and filed an unrestricted rape report.
Special Agent (SA) Ellis interviewed Marsh the same day that CG filed her unrestricted report. Marsh waived his rights and agreed to speak with SA Ellis. Marsh initially told SA Ellis that he and CG had consensual sexual intercourse in her room before they left her barracks room for the club. Later in the interview Marsh admitted that the intercourse occurred after they returned to her barracks room from the hotel, but again maintained that it was consensual. Marsh apologized to the agent for the deception and said that he thought CID wouldn’t want to hear that he had sexual intercourse with someone who had been drinking.

DISCUSSION

I. Trial counsel’s reference to Marsh’s un-sworn statement
Marsh gave an unsworn statement during the presentencing proceeding. Subsequently, the president of the panel asked the military judge what the difference was between a sworn and unsworn statement. The military judge said that he would give the panel an instruction on how to treat an unsworn statement, but did give the following brief description at that time: “It basically means an unsworn statement, which a Soldier has the right to do, he [sic] may not be cross-examined upon an unsworn state *104 ment.” The president asked if the court members could ask questions of Marsh and the military judge responded that they could not and reiterated that after hearing arguments on sentencing, the court members would receive further instructions.
During sentencing argument, trial counsel commented on Marsh’s unsworn statement:
Now the judge will instruct you on the difference between a sworn and an un-sworn statement. The [Government would ask you to give less weight to this unsworn statement — the accused’s un-sworn statement. The accused was not subject to cross-examination, he did not answer questions from the [Government nor from you.
Defense counsel did not object. During sentencing instructions, the military judge instructed the court members on how they were to consider Marsh’s unsworn statement:
The court will not draw any adverse inference from the fact the accused has elected to make a statement which is not under oath. An unsworn statement is an authorized means for an accused to bring information to the attention of the court and it must be given appropriate consideration. The accused cannot be cross-examined by the prosecution or interrogated by the court members or myself upon an un-sworn statement, but the prosecution may offer evidence to rebut any statement of fact contained in such an unsworn statement. The weight and significance to be attached to an unsworn statement rests within the sound discretion of each court member. You'may consider the statement is not under oath, its inherent probability, or improbability, whether it’s supported or contradicted by other evidence in the case, as well as any other matter that may have a bearing on its credibility. In weighing an unsworn statement, you are expected to use your common sense and your knowledge of human nature and the ways of the world.
Marsh argues that it was plain error for the trial counsel to invite the court members to draw a negative inference from Marsh’s decision to make an unsworn statement. He argues that the trial counsel knew that the president of the panel was interested in asking questions and used this to improperly invite the panel to penalize Marsh for exercising his right.
The Government responds that the trial counsel’s comment remained within the bounds of permissible argument. The Government goes on to argue that, in any event, Marsh suffered no prejudice because the trial counsel’s comments were consistent with the military judge’s instructions and the evidence supporting the sentence was strong.
Improper argument is a question of law that we review de novo. United States v. Pope, 69 M.J. 328, 334 (C.A.A.F.2011). Since the defense counsel did not object to trial counsel’s sentencing argument, we review Marsh’s claim for plain error. United States v. Erickson, 65 M.J. 221, 223 (C.A.A.F.2007). To prevail, Marsh must prove that: “(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right.” Id. (citation and quotation remarks omitted).
In Breese, after the accused made an un-sworn statement, trial counsel argued: “‘[a]nd when you consider the accused’s statement, I ask you to consider something different about the accused’s statement. Everybody else who sat in that box today took an oath to tell the truth.’ ” 11 M.J. at 23 (alteration in original). The defense counsel objected to this statement but the objection was overruled. Id. The military judge in Breese provided the members with essentially the same instruction that the military judge provided in this case. See id. Before this court, Breese argued that the trial counsel’s argument implied that he was lying since his statement was not under oath. Id. Noting that the military judge’s instructions provided the members with correct guidance, we held:
The truth of the matter is that these statements are not made under oath and, thus, the “unsworn statement is not evidence.” Merely urging the court members to consider an unsworn statement for what it is falls within the boundary of fair prosecuto-rial comment. Here the challenged state *105 ment seems only to have been directed towards that end and did not constitute an invitation for the court members to draw an adverse inference against the appellant.
Id. at 24 (citations omitted).
The military judge in this case correctly instructed the panel that Marsh could not be cross-examined by the Government or interrogated by the court members. He further instructed them that they could consider that Marsh did not make his statement under oath and could also consider any other matter that may have a bearing on the statement’s credibility. The trial counsel’s statement did nothing more than ask the court members to consider Marsh’s unsworn statement in light of the fact that he was not subject to cross-examination and therefore urged them to give it less weight. In fact, Marsh’s statement was not subject to cross-examination and the members could legitimately consider that fact in assessing its credibility. This aspect of trial counsel’s argument fell within the boundary of fair pros-ecutorial comment. See id. As there was no error, the remaining prongs of the plain error inquiry need not be considered.
II. Trial counsel’s argument that Marsh could not be trusted with the lives of pilots
During the sentencing phase of the court-martial, Marsh’s squad leader, Sergeant Pat C. Nieto, testified on his behalf. Sergeant Nieto testified that he rated Marsh in the top ten percent of the soldiers he supervised. He further testified that Marsh was “invaluable to me in training new soldiers coming in.” The fact that Marsh had been convicted of a false official statement would not cause Sergeant Nieto any concern in serving and deploying with him. On cross-examination, Sergeant Nieto was asked if Marsh was currently working in his MOS[4] as a helicopter repairman. Sergeant Nieto responded that he was not. On redirect, Sergeant Nieto clarified that Marsh was not actually “turning wrenches” but was supervising new soldiers. The military judge then asked why Marsh was not working in his MOS and Sergeant Nieto explained:
Gentlemen, the reason Private Marsh is not serving in his MOS in Aviation is any time a Soldier is in trouble for anything, we usually restrict him from working on the aircraft as to not cause a problem with the aircraft. As we hold the pilots’ lives in our hands everyday, we don’t want his ideas and stuff going on in his head or his concerns to translate over to the job either inadvertently or purposely. So in this case, the commander the [sic] first sergeant restricted him from working on the aircraft until — pending the results of his trial. And that is the reason he is not working on the aircraft at this moment.
Sergeant Nieto further clarified the situation during recross-examination:
Q: You said that you don’t — he can’t touch aircraft because you don’t want ideas in his head inadvertently or purposely transferring to other Soldiers or to—
A: No, sir, if I may clarify. When working on the aircraft, you hold peoples’ lives in your hand [sic] on a daily basis. We don’t want Private Marsh thinking about his case or something going on with his case that would interfere with his thought process while working on an aircraft so that he wouldn’t accidently do something to the aircraft or forget to put a bolt on the right way or something to that nature that would cause a problem with the aircraft.
In his sentencing argument, the trial counsel argued that the court members could not trust Marsh with the lives of pilots because he lied to SA Ellis:
Because a good Soldier doesn’t lie. The [G]overnment would argue that this Soldier should absolutely not remain in our Army that values integrity and honor, not lies and not deceit. You can’t trust the accused. The accused is an aircraft mechanic, someone you trust to work on your airplanes, to tighten that bolt, to make sure that those aircrafts are worthy to fly, *106 to do rescue missions, to serve this Army. Can you trust someone who lies with the lives of those pilots?
Emphasis added.
Marsh argues that the trial counsel unduly inflamed the passions of the court members on two grounds: his conviction for false official statement bears no relevance to his duty or ability to repair aircraft; and, the trial counsel invited the court members to put themselves in an aircraft repaired by Marsh and then instilled fear that the aircraft would crash.
The Government responds that the trial counsel simply rebutted Marsh’s sentencing witnesses’ testimony that he could be trusted and commented on his character for future service. The Government argues that Marsh’s truthfulness is highly relevant to whether rehabilitation could be successful or whether Marsh can complete his duty with good order and discipline. Rather than inflame court members, the Government asserts that the trial counsel was simply referring to Sergeant Nieto’s statement “that aircraft mechanics are entrusted with pilots’ lives.”
As in the first issue, improper argument is a question of law that we review de novo. Pope, 69 M.J. at 334. Since the defense counsel did not object to the trial counsel’s comments, we again review for plain error. Erickson, 65 M.J. at 223. Marsh must prove the existence of error, that the error was plain or obvious, and that the error resulted in material prejudice to a substantial right. Id.
“[Tjrial counsel is at liberty to strike hard, but not foul, blows.” Schroder, 65 M.J. at 58 (citation and quotation marks omitted). As a result, “it is error for trial counsel to make arguments that ‘unduly ... inflame the passions or prejudices of the court members.’” Id. (quoting Clifton, 15 M.J. at 30). The trial counsel also must not inject matters that are not relevant into argument. Id. (citing United States v. Fletcher, 62 M.J. 175, 180 (C.A.A.F.2005); R.C.M. 919(b) Discussion). Nor can the trial counsel ask court members to place themselves in the shoes of the victim or a near relative. United States v. Baer, 53 M.J. 235, 237-38 (C.A.A.F.2000).
While this court has not previously examined whether a prosecutor can properly ask court members to place themselves in the shoes of potential future victims, the United States Court of Appeals for the Sixth Circuit has addressed this issue. In Hodge v. Hurley, 426 F.3d 368, 384 (6th Cir.2005), that court held that a suggestion that the jury put itself in the place of someone who may run into the defendant on the street is impermissible argument. This is because trial counsel must not “fan the flames of the jurors’ fears by predicting that if they do not convict ... some ... calamity will consume their community.” Bedford v. Collins, 567 F.3d 225, 234 (6th Cir.2009) (citation omitted).
Trial counsel personalized his argument to the panel members by referring to Marsh as working on “your” aircraft and questioning whether Marsh could be trusted with the lives of the unit’s pilots. We believe that this portion of trial counsel’s argument constituted error and that it was plain and obvious. We can find no rational nexus between the fact that Marsh lied to SA Ellis during the investigation and the assertion that he could not be trusted with the lives of pilots in the future. The Government’s argument that the comment was merely reflecting the testimony of Marsh’s squad leader is not supported by the record. It is clear from Sergeant Nieto’s testimony that Marsh was placed in a supervisory role only for the duration of his court-martial because he might be “thinking about his case or something going on with his case that would interfere with his thought process.”
It cannot be reasonably inferred from this record that those concerns would extend beyond the conclusion of the trial. In fact, just the opposite is true. Sergeant Nieto and Marsh’s First Sergeant testified that they would serve and deploy with Marsh again. Consequently, the trial counsel’s assertion that the court members could no longer trust Marsh to perform his assigned duties is not supported by the testimony of Marsh’s immediate supervisors — the only testimony on this *107 subject in the record. Trial counsel’s invitation to the court members to imagine themselves as potential future victims only served to inflame a fear as to what might happen if the panel did not adjudge a discharge. See Hodge, 426 F.3d at 384; Bedford, 567 F.3d at 234.
Our final analysis concerns whether this error prejudiced Marsh. Here we balance the severity of the improper argument, any measures by the military judge to cure the improper argument, and the evidence supporting the sentence to determine whether the “ ‘trial counsel’s comments, taken as a whole, were so damaging that we cannot be confident’ that [the appellant] was sentenced ‘on the basis of the evidence alone.’” Erickson, 65 M.J. at 224 (quoting Fletcher, 62 M.J. at 184).
As we discussed earlier, trial counsel’s argument that Marsh could not be trusted to work on helicopters in the future because of his conviction for making a false official statement lacks both a rational nexus and factual support in the record. The more serious aspect of trial counsel’s argument was his invitation to the members that they place themselves in the shoes of future victims of Marsh’s alleged inability to perform his duties and to imply that the lives of the unit’s pilots would be at risk. There is nothing in the record that supports this assertion and it clearly was unduly inflammatory. Although the military judge gave the standard instruction before findings arguments that counsels’ arguments are not to be viewed as evidence, he provided no specific curative instruction in response to trial counsel’s sentencing argument.[5]
In looking at the weight of evidence supporting the sentence, we note that the Government did not present a significant case in aggravation. In fact, the Government only introduced Marsh’s Enlisted Record Brief (ERB), which contained no derogatory information, and rested their sentencing case without calling any witnesses. Marsh, on the other hand, called three character witnesses and made an unsworn statement. His first character witness was First Sergeant Roque Quichocho, who testified that Marsh had worked for him as a crew chief both at Fort Bragg and in Iraq. The First Sergeant testified that Marsh was intelligent, had a great work ethic, and that he could rely on him to complete sergeant level tasks without supervision. He testified that Marsh was “an all-around pretty good [s]oldier” and he would have no qualms in serving or deploying with him again. The next character witness was Marsh’s squad leader Sergeant Nieto, who testified that Marsh ranked in the top ten percent of his troops and that he would serve and deploy with him again. His final character witness was Marsh’s father who testified as to Marsh’s upbringing, his work ethic, and the family’s pride in Marsh’s service.
The Government argues that there was no prejudice as the maximum sentence for this offense is a dishonorable discharge and five years of confinement and Marsh was only sentenced to a bad-conduct discharge, forfeiture of $1,347.00 pay for one month, and reduction to E-l. However, given the maximum authorized sentence and the sentence adjudged, it is apparent that the panel was somewhat receptive to the defense sentencing argument. As a result, it is not clear that Marsh’s sentence was unaffected by the trial counsel’s improper argument. Taking into consideration the record as a whole, including the relative weight of the parties’ respective sentencing cases and trial counsel’s improper argument, we cannot be confident that Marsh was sentenced on the basis of the evidence alone.

DECISION

The decision of the United States Army Court of Criminal Appeals is affirmed as to findings, but is reversed as to the sentence. The sentence is set aside and the record is returned to the Judge Advocate General of the Army. A sentencing rehearing is authorized.

. We note that this forfeiture exceeds the maximum forfeiture allowed when the sentence does not include confinement (two-thirds of a month’s pay based on the adjudged reduction to the pay grade of E-1). United States v. Warner, 25 M.J. 64, 67 (C.M.A.1987); Rule for Courts-Martial (R.C.M.) 1003(b)(2).

. We granted review of the following issues:
I. Whether it was plain error for trial counsel to argue that the panel should draw adverse inferences from Appellant's failure to testify under oath during presentencing because Appellant would not answer her questions or theirs.
*103 II. Whether trial counsel sought to inflame the passions of the 82nd Airborne panel by implying that Appellant’s false official statement during a rape investigation puts pilots' lives in danger.
United States v. Marsh, 69 M.J. 455 (C.A.A.F. 2010) (order granting review).

. A restricted report allows a sexual assault victim to confidentially report the details of the assault, and receive treatment and counseling, without initiating an official investigation. Dep’t of the Army, Reg. 600-20, Personnel — General, Army Command Policy para. 8-4(c) (Mar. 18, 2008). In contrast, an unrestricted report initiates an official investigation. Id. at 8-4(d).

. Military occupational specialty. Dep't of the Army, Reg. 611-1, Personnel Selection and Classification, Military Occupational Classification Structure Development and Implementation para. 6-4 (Sept. 30, 1997).

. Generally, potential harm from improper comments can be cured through a proper curative instruction. See United States v. Ashby, 68 M.J. 108, 123 (C.A.A.F.2009).